IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 9, 2019

## STATE OF TENNESSEE v. CRAIG MARKEEM TAYLOR

**Appeal from the Circuit Court for Madison County**
**No. 14-657    Kyle Atkins, Judge**

_____

### No. W2018-00242-CCA-R3-CD

_____

The Defendant, Craig Markeem Taylor, was convicted by a Madison County jury of first degree premeditated murder, two counts of first degree felony murder, attempted aggravated burglary, and two counts of attempted aggravated robbery. The trial court merged the felony murder convictions into the first degree premeditated murder conviction and sentenced the Defendant to life for the murder conviction, five years for each of the attempted aggravated robbery convictions, and three years for the attempted aggravated burglary conviction. The court ordered the attempted robbery sentences to be served concurrently with each other but consecutively to the sentence for first degree murder. The court ordered that the sentence for attempted aggravated burglary be served consecutively to the sentences for attempted aggravated robbery, for a total effective sentence of life plus eight years in the Department of Correction. On appeal, the Defendant challenges the sufficiency of the evidence and argues that the trial court committed reversible error by excluding proposed witness testimony on the erroneous basis that it constituted alibi testimony for which the State had not received prior notice. Following our review, we affirm the judgments of the trial court but remand for entry of a corrected judgment in count five in order for the "Jury Verdict" box to be checked to reflect that the Defendant was convicted of the indicted offense pursuant to a jury verdict.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**
**and Case Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and J. ROSS DYER, J., joined.

Joseph Taggart, Jackson, Tennessee, for the appellant, Craig Markeem Taylor.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Benjamin C. Mayo, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

On November 15, 2012, Pharrah Smartt was in the process of retrieving her infant son from her car parked outside the Jackson home she shared with her boyfriend, Devon Staten, when a masked gunman approached and attempted to force her into the house with him. She reacted by screaming and falling to the ground, and Mr. Staten, who was inside the house, reacted to her screams by coming to her aid armed with his 9-millimeter pistol. Mr. Staten was shot and killed during the ensuing exchange of gunfire between him and the masked gunman and his armed accomplice. The Defendant was developed as a suspect based on a witness's statement that he was at the scene near the time of the shooting, and his DNA and palm print were later found to match, respectively, the DNA obtained from a mask found at the crime scene and a latent palm print found on the air conditioning unit outside the home. He was subsequently indicted for the first degree premeditated murder of Mr. Staten, the first degree felony murder of Mr. Staten during the attempted perpetration of armed robbery, the first degree felony murder of Mr. Staten during the attempted perpetration of aggravated burglary, the attempted aggravated robberies of Mr. Staten and Ms. Smartt, and the attempted aggravated burglary of their home.

### State's Proof

Sergeant Isaiah Thompson of the Jackson Police Department, the lead investigator in the case, testified that the Defendant became a suspect early in the investigation because a witness reported seeing him at the scene thirty minutes prior to the shooting. Investigators also learned that the Defendant was seen limping, possibly due to a gunshot, after the shooting. Sergeant Thompson said he attempted to locate the Defendant at the addresses they had for him but was unsuccessful. In the meantime, he was able to eliminate another potential suspect who had sustained a gunshot wound at about the same time but whose DNA did not match the DNA on the mask found at the scene.

In January 2014, the Defendant was finally located in Ripley, Tennessee, and Sergeant Thompson and Investigator Aubrey Richardson interviewed him there. The Defendant denied any knowledge of the 2012 Jackson shooting but admitted that he had sustained a gunshot wound and took off his shoe to show the investigators where he had been shot in the foot. The Defendant told the investigators that his cousin from Chicago

had shot him approximately two years earlier and that he had let the wound heal on its own without going to the hospital. The Defendant would not provide the name of the cousin but consented to giving a buccal swab. When the DNA results came back showing the Defendant to be a match to the DNA found on the mask, Sergeant Thompson obtained a search warrant for the Defendant's palm print, which was found to match a palm print that had been found on an air conditioner at the crime scene.

On cross-examination, Sergeant Thompson acknowledged that shell casings from three different weapons were found at the scene: the murdered victim's 9-millimeter, a .45-caliber, and a .40-caliber. He said he spoke at the scene with Mr. Staten's cousin, Kenneth Deberry, who informed him he had been playing video games with Mr. Staten all day but had left and was at home at his nearby residence when he heard gunshots and ran outside. During that initial interview, Mr. Deberry also reported that he had seen the Defendant in the area. Sergeant Thompson testified that he went to "great lengths" in his efforts to locate the Defendant, including searching utility records to try to locate his mother's residence and talking to neighbors on the street. He said Ms. Smartt described her assailant as dressed in dark clothing and a camouflage mask. She also provided a physical description of his body that matched the Defendant's body type and height. To his knowledge, she only identified one assailant.

Dr. David Zimmerman, the medical examiner who performed the autopsy of Mr. Staten's body, testified that he determined that the cause of death was multiple gunshot wounds, the manner of death was homicide, and the circumstance of death was "shot by other." He said the victim sustained an entry and exit gunshot wound to his right arm and an entry wound to his torso in which the bullet fractured his rib and injured his lungs and his heart. He was unable to determine whether the gunshot wounds to the victim's arm and torso were caused by the same bullet or by two separate bullets. He identified the single bullet he recovered from the victim's torso, which was admitted into evidence.

Laynatia Bell, the murdered victim's mother, testified that at the time of his death, Mr. Staten was twenty-four-years old and lived in a home in Jackson with Pharrah Smartt and their fifteen-month-old son.

Pharrah Smartt testified that shortly before 5:00 p.m. on November 15, 2012, she returned to the Jackson home she shared with Mr. Staten and their son after having taken the child to a doctor's appointment. She said she first carried some take-out food inside before returning to her car to retrieve her sleeping son. As she was crossing the driveway, she heard rustling leaves from the side of the house where the air conditioner was located, looked, and saw a gunman approaching who was dressed in dark clothing, a dark army fatigue-style camouflage mask, and possibly a "hoodie." Although the mask covered his full face, she was able to tell from the uncovered skin around the gunman's

eyes that he was African American. Ms. Smartt identified a camouflage mask that had been found at the scene as appearing to be the same one the gunman wore.

Ms. Smartt testified that she initially froze and began screaming and then backed up and fell down in a ditch. As she continued screaming, the man crouched down beside her, still armed with his gun, and said, "Be quiet, be quiet. Come on, let's go in the house." She next heard "a lot" of gunshots. When the gunfire stopped, she got up and ran into the house, where she saw Mr. Staten gasping for breath as he lay on the floor between the kitchen and the living room close to the open back door. She did not see the gunman or any accomplice but based on Mr. Staten's position near the open back door, she assumed that Mr. Staten had run to the kitchen with his gun as the assailants "ran on the side of the house[.]" Ms. Smartt identified a photograph of the air conditioning unit on the side of her house, which was entered as an exhibit.

On cross-examination, Ms. Smartt testified that she did not know the Defendant. She said she briefly saw Mr. Staten on their front porch stoop before the shooting began but did not actually see him shooting.

Kenneth Deberry, Mr. Staten's first cousin, testified that he and Mr. Staten played video games together at Mr. Staten's house for most of the afternoon on November 15, 2012. Because Mr. Staten was beating him badly, he left sometime between 4:00 and 5:00 p.m. for his own home, which was located across the street and three doors down from Mr. Staten's home. As he was walking home, he saw two men dressed in solid black clothing walking past Mr. Staten's home. The men were behind him, and as he looked back, he saw one of them raise his hood and cut down the driveway between Mr. Staten's home and the home next door. Mr. Deberry testified that he easily recognized the man as the Defendant, with whom he had attended school and played basketball, because the Defendant was only ten feet from him and made direct eye contact with him. Mr. Deberry made a positive courtroom identification of the Defendant as the man he saw that afternoon. He said the second man was also wearing a hood and that he accompanied the Defendant between the houses. He did not recognize the second man.

Mr. Deberry testified that he lost sight of the men when they went down the driveway toward the shed in Mr. Staten's backyard. He said he had been home for no more than twenty to twenty-five minutes when he heard gunshots, grabbed his gun, and ran across the street to Mr. Staten's home, where he found Mr. Staten lying slowly dying on the floor inside the home. After waiting for the police to arrive, he went with other family members to the hospital but soon left with his brother and a cousin.

Mr. Deberry testified that he, his cousin, and his brother stopped at a service station on their way home, where he waited in the car while his brother and his cousin

went inside. As he waited, he saw a man dressed all in black limping down the street. When his brother and his cousin emerged from the store, he and his cousin followed the man on foot until they saw him get into the rear seat of a burgundy SUV parked at another service station. Mr. Deberry testified that he walked in front of the SUV, looked through the front windshield, and recognized the Defendant as the limping man who had just gotten into the rear seat. He was positive that neither the Defendant nor his companion was limping when he saw them walk past Mr. Staten's home before the shooting.

On cross-examination, Mr. Deberry testified that he had gone to school with the Defendant and played basketball with him on the same church league basketball team. He said he had never known the Defendant to be aggressive.

Aimee Oxley, director of the property and evidence unit of the Jackson Police Department and an expert in latent print analysis, identified, among other things: a 9-millimeter pistol that was found on the kitchen floor inside Mr. Staten's home, seven 9-millimeter shell casings that were found on the front porch stoop and inside the kitchen near the back door; a 9-millimeter bullet fragment that was found in the back yard; five .45-caliber shell casings that were found in the street and in the front yard of the house; two .40-caliber shell casings that were found on either side of the home's driveway; a spent projectile recovered from the passenger-side front visor of a car parked on the street; and a camouflage mask that was found in the backyard near the tree line close to the spent 9-millimeter bullet. She said she was able to lift five latent prints from the air conditioner outside the home, but only two of them had sufficient ridge detail to be useful for identification purpose. She later identified one of the latent palm prints from the air conditioner as the Defendant's left palm print.

On cross-examination, she testified that the mask was found on top of some bushes at the tree line in the backyard of the home and that there was no way to determine how long it had been there. She acknowledged that the second latent palm print found on the air conditioner was not the Defendant's. She further acknowledged that she was unable to find any blood trail leading from the area, despite her search. On redirect examination, she testified that, from the trajectory, it appeared as if the spent 9-millimeter projectile found in the back yard had been fired from the back door area of the home.

Investigator Aubrey Richardson of the Jackson Police Department testified that during a January 18, 2014 interview with the Defendant in Lauderdale County, the Defendant told him that he had been shot in the foot by his cousin approximately two years earlier and had let the wound heal on its own without seeking medical treatment. The Defendant removed his sock and showed Investigator Richardson a scar on his toe.

- 5 -

The Defendant said he could not recall his cousin's name or where he lived. During the same interview, the Defendant gave consent for Investigator Richardson to collect a buccal swab from his mouth for DNA analysis. On cross-examination, Investigator Richardson testified that the Defendant was calm and respectful during the process.

Sergeant Chris Chestnut of the Jackson Police Department identified a photograph he took of a scar on the Defendant's foot, which was subsequently admitted as an exhibit. He said the Defendant told him the scar resulted from a gunshot wound and that he had not seen a physician for treatment of the wound. Sergeant Chestnut testified he observed "heavy scarring" on the Defendant's middle toe.

Tennessee Bureau of Investigation ("TBI") Special Agent Forensic Scientist Cervinia Braswell, an expert in ballistics, testified that all seven 9-millimeter cartridge cases and the 9-millimeter bullet jacket, or piece of a bullet, came from the 9-millimeter weapon that was submitted for analysis. She said all five .45 auto caliber cartridge cases came from the same unknown .45 auto caliber pistol, and the two .40-caliber cartridge cases were fired from the same unknown .40-caliber pistol. The spent projectile recovered from the car's front visor was identified as a .45-caliber bullet, but she was unable to determine if it came from the same weapon as the .45-caliber casings because she did not have the weapon for comparison.

TBI Special Agent Forensic Scientist Lawrence James, an expert in serology and DNA analysis, testified that he compared the DNA found on the mask to the DNA profile of the Defendant. He said the Defendant was a major contributor to a mixture of DNA found on the nose and mouth portion of the mask. According to Agent James, the "probability of randomly selecting an unrelated individual with the same DNA profile [was] one in a number greater than the current world population[.]" On cross-examination, he acknowledged that the fact that the Defendant's DNA was on the mask did not necessarily mean that the Defendant ever wore the mask.

### Defendant's Proof

The Defendant's stepfather, Barry Maurice Cockrell, testified that on November 15, 2012, he spent four or five hours renovating his boyhood home, which was located less than an eight to ten minute walk from Mr. Staten's home if one walked by road and less if one used a wooded trail behind the subdivision. He was able to recall the specific day because he heard gunshots during the time he was there and later saw the shooting incident reported on the news. He said the Defendant and the Defendant's mother were with him when he went to the home, and both were with him when he left after finishing his work for that day.

On cross-examination, he testified that the Defendant was not in his "visual sight" when he heard the gunshots. He could not recall how much time elapsed from the sound of the gunshots until he saw the Defendant again or until he, the Defendant, and the Defendant's mother left the house.

Tyler Taylor, the Defendant's younger brother, testified that he and the Defendant had spent a lot of time in the neighborhood subdivision, which was a semi-rural area, playing in the woods and riding four-wheelers over the area trails. On cross-examination, he acknowledged that he and the Defendant were very familiar with the area and knew how to cut through the woods to reach different parts of the neighborhood.

Tracy Cockrell, the Defendant's mother, testified that the Defendant was a quiet child who had been diagnosed with autism and never got into any trouble until his senior year of high school, when he got into a fight with a fellow student. Because of that altercation, the Defendant went to live with her sister in Ripley in order to complete his high school education. After he graduated in 2011, he moved back to Jackson to live at home with her, and he remained with her continuously throughout 2012 and 2013. Ms. Cockrell said that no one from the Jackson Police Department or the Madison County Sheriff's Department ever contacted her about the Defendant.

She testified that when the Defendant was fourteen or fifteen, he, his brother, and a cousin from Chicago were playing with a BB gun when the Defendant was accidentally shot in the foot. She said the injury just involved "a little scraped skin" so she put antibiotic ointment on it and let the boys go on their way after she "whooped everybody" and took the gun from them. She further testified that she and her children formerly lived in the subdivision where the shooting occurred and regularly rode four-wheelers in the woods behind the subdivision. According to her testimony, the Defendant frequently wore a face mask during his four-wheeler rides to prevent getting scratched by tree branches.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant first argues that the evidence is insufficient to sustain the jury's verdicts. Specifically, he challenges the evidence of his identity as the "offending gunman." In support, he cites, among other things, evidence that he was a frequent visitor to the area, the multiple unidentified palm prints on the air conditioner, the fact that other individuals provided some of the DNA found on the mask, and the multiple weapons of different calibers involved in the shooting. The State points out that the doctrine of criminal responsibility makes it unnecessary to show conclusively which of

the assailants fired the fatal bullet and argues that the evidence was ample for the jury to identify the Defendant as one of the two assailants.  We agree with the State.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

A criminal offense may be established entirely by circumstantial evidence.  State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010).  It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence.  State v. James, 315 S.W.3d 440, 456 (Tenn. 2010).  "Identification of a defendant as the person who committed the offense for which he or she is on trial is a question of fact for the jury's determination upon consideration of all competent proof."  State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  See State v.Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  It is not the role of this court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact.  State v. Reid, 91 S.W.3d 247, 277 (Tenn. 2002).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient."  State v. Tuggle, 639 S.W. 2d 913, 914 (Tenn. 1982).

Viewed in the light most favorable to the State, the proof was more than sufficient to establish the Defendant's identity as the gunman who accosted Ms. Smartt outside the home, attempted to force her into the home with him, and, along with an armed accomplice, engaged in an exchange of gunfire with Mr. Staten when Mr. Staten came to Ms. Smartt's defense.  The proof was also more than sufficient to establish that the victim died as a result of a bullet fired by either the Defendant or his armed accomplice.  We agree with the State that it matters not whether the fatal bullet was fired by the Defendant or his accomplice.  The jury was instructed on the doctrine of criminal responsibility, under which a person is criminally responsible for the actions of another if, "[a]cting with

intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Tenn. Code Ann. § 39-11-402(2). Criminal responsibility is not a separate crime but "is solely a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). We, therefore, conclude that the evidence was sufficient to sustain the Defendant's convictions.

## II. Exclusion of Testimony as Alibi Defense

The Defendant next contends that the trial court erred by excluding portions of Mr. Cockrell's testimony under the mistaken finding that it constituted alibi testimony. The record reflects that the State raised an objection after Mr. Cockrell testified that he had heard gunshots when he was working on renovations at his boyhood home, that the Defendant and Mrs. Cockrell were at the home with him, and that the Defendant and Mrs. Cockrell left the home with him after the family had been there for four or five hours. The State argued that the Defendant was attempting to establish an alibi through Mr. Cockrell's testimony and the trial court agreed, noting that the implication of Mr. Cockrell's testimony was that the Defendant was with Mr. Cockrell at the time of the gunshots. When the jury returned to the courtroom, Mr. Cockrell continued his testimony by reiterating that he heard gunshots sometime during the four to five hours he was working on the home and adding that it was not unusual for him to hear gunshots in that area. On cross-examination, Mr. Cockrell grudgingly acknowledged that the Defendant was not with him, or in his "visual sight," at the time he heard the gunshots.

The Defendant asserts that the testimony he sought from Mr. Cockrell, which was unfairly excluded by the trial court, did not constitute an alibi and consisted of the following key points: (1) that the Defendant rode to the neighborhood with Mr. and Mrs. Cockrell; (2) that the Defendant had a reasonable explanation for being in the area because his family owned property there, and he was assisting his mother and stepfather in the home's renovations; (3) that Mr. Cockrell remained in the neighborhood for four to five hours; (4) that Mr. Cockrell heard gunshots at some point while he was in the neighborhood; (5) that Mr. Cockrell did not know where the Defendant was located at the time he heard the gunshots; and (6) that the Defendant left the neighborhood with Mr. Cockrell.

The State responds that Mr. Cockrell was allowed to testify as to each of the above points and argues that the Defendant has failed to show that he was prejudiced by the trial court's ruling. We agree with the State. We also agree with the trial court that the implication of Mr. Cockrell's testimony, until corrected by the State on cross-examination, was that the Defendant was with Mr. Cockrell at the time of the shooting

and therefore could not have been one of the armed assailants. We find no error in the trial court's ruling and no prejudice created to the Defendant. The Defendant is not entitled to relief on the basis of this issue.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court. We note, however, a clerical error in the judgment form for count five, in that the jury verdict box was not checked. Accordingly, we remand for entry of a corrected judgment for that count.

_____
ALAN E. GLENN, JUDGE